FILED

07/07/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0451

DA 25-0451

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 147

DENNIS BURTON and JEANNETTE BURTON,

      Petitioners and Appellants,

   v.

FLATHEAD CONSERVATION DISTRICT,

      Respondent and Appellee.

APPEAL FROM:   District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DV-24-594(A)
Honorable Amy Eddy, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

      Mark L. Stermitz, Crowley Fleck PLLP, Missoula, Montana

      For Appellee:

      Camisha Booth Sawtelle, Sawtelle Law Firm PLLC, Whitefish, Montana

Submitted on Briefs:  January 14, 2026

Decided:  July 7, 2026

Filed:

                                _____
                                      Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Dennis and Jeannette Burton (Burtons) appeal the order entered by the Eleventh Judicial District Court, Flathead County, which granted summary judgment in favor of the Flathead Conservation District (FCD), and upheld the FCD's denial of Burtons' application for a "310 permit" to undertake work on their property along the Flathead River. We affirm, and consider:

*Whether the District Court erred by granting the FCD's motion for summary judgment upholding the FCD's denial of Burtons' application for a 310 permit.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Burtons have a residence near Kalispell, Montana, on a property lying along the Flathead River. There exists on Burtons' property what the parties agree is a natural pond (Pond), described as an historical "scour feature" of the River, which holds water for at least some parts of the year and occasionally dries up, depending on the volume of water in the River. Over decades, the Pond has been dredged to remove silt and was utilized by Burtons and previous owners, including Donald Burton, Dennis' father. At some point in the past, probably in the 1990s prior to Burtons' ownership of the property, and by persons unknown, a channel was dug from the River to the Pond, presumably to expand a natural ditch or waterway and enhance the flow of water into the Pond (Channel), making the Channel and Pond accessible by boat. These characteristics and the history of the property present a challenging application of the FCD's rules, titled Adopted Rules,[1] which classify

---

[1] The full title is "Adopted Rules For the Flathead Conservation District to Implement the Natural Streambed and Land Preservation Act of 1975."

"natural" and "artificial" water bodies, define "in-stream" versus "off-stream" ponds, and provide occasionally tempered parameters, such as "[o]ff-stream ponds that are connected to a natural stream channel are discouraged." Adopted Rules, Chap. 3, O.(2)(b).

¶3 During times of seasonal high flows in the River, Burtons' pole barn, located on their property, often floods. In January 2024, Burtons applied to the FCD for a stream project permit pursuant to § 75-7-101, et. seq., MCA, the Natural Streambed and Land Conservation Act (Act or 310 Law)[2] for the purpose of "construct[ing a] berm on their property to protect the pole barn when the water rises." In Burtons' later Petition for Judicial Review filed in the District Court, they explained they had "engaged an engineer who developed a plan to dredge the silt from the [C]hannel and [P]ond to restore it to its former depth, and to use the dredged material to create a berm that would create protection from flooding." The Application assured that the project area would be protected from erosion, would not disrupt aquatic habitat, and would not affect the River's water flow—the potential for which FCD would assert in the litigation.

¶4 FCD Commissioners conducted a site visit of Burtons' property on February 26, 2024. Thereafter, a Team Member Report from the visit was prepared that stated the project had "potential for erosion," "could capture river flows," could "isolate fish and cause warm water discharge in [the] summer," and recommended the Application be denied. The FCD denied the application in March 2024, incorporating the Team Member Report's findings, and reasoning that the project did not appear to meet the stated purpose

---

[2] The Act was originally enacted in the 1975 Legislature, introduced as Senate Bill 310, thus the "310 Law" moniker.

of protecting the pole barn and was in conflict with the Adopted Rules, citing the prohibition upon dredging for "enlarging, or improving an artificial harbor, lagoon, or in-stream pond[,]" and the Rules' findings that "[o]ff-stream ponds that discharge back to streams can cause adverse/harmful stream channel changes[]" and "water quality changes[,]" and that therefore such ponds were discouraged.

¶5 Burtons filed a Petition for Judicial Review and Declaratory Judgment with the District Court, seeking reversal of the denial of the application. Burtons contended that "[FCD's] denial of the 310 permit [was] unlawful because it [was] not supported by the facts, exceeds FCD's jurisdiction, was arbitrary, capricious or otherwise not in accordance with law," noting that FCD's decision included conclusions without supporting reasoning, such as why the project did not appear to meet the stated purpose of protecting the pole barn. They further contended in their summary judgment briefing that FCD had failed to review the application "dispassionately" and had "include[d] citation to documents unrelated to Burton's 2024 application[.]"[3] In addition to seeking judicial review of the denial, Count II of Burtons' Petition stated, "[a]lternatively, Burtons seek a declaration pursuant to the Uniform Declaratory Judgment Act, Mont. Code Ann. § 27-8-101, *et seq*., that FCD unlawfully denied Burtons' 310 permit application." FCD disputed Burtons'

---

[3] These "unrelated documents" refer to previous permit applications filed by Dennis's father. In its summary judgment briefing, FCD stated that Donald Burton (Donald) filed 10 permit applications when he owned the property. Six of those, which did not include dredging the Channel, were approved by the FCD. However, in one of the prior applications to enlarge the Channel and Pond, a report from Montana Fish Wildlife and Parks urged denial of the application because "[t]he proposed excavation of the ditch and wetland do not meet the intent of the Natural Streambed and Land Preservation Act (310 law) to preserve streams in their natural, unaltered state as closely as possible." The Pond on Burtons' property was formerly dubbed a "lagoon" in Donald's applications.

claim that it did not have jurisdiction over the application, contending "[t]here are no disputed facts that this is a project under § 75-7-103(5), M.C.A. and that FCD correctly assumed jurisdiction."

¶6 The District Court granted summary judgment to FCD and upheld the denial of Burtons' application. Noting the definition of "project" in § 75-7-103(5), MCA, as "a physical alteration or modification that results in a change in the state of a natural, perennial-flowing stream or river, its bed, or its immediate banks," the District Court concluded that FCD had jurisdiction here because there was sufficient evidence the Pond was "an in-stream pond and that the man-made [C]hannel connects the [P]ond with the Flathead River," thus presenting "a physical alteration that could result in a change in the state of the Flathead River, a natural perennial-flowing stream." While FCD had entered some conclusions without explanation, the District Court reasoned there were other bases on which the FCD had properly denied the application. Noting there was record support of a connection between the River and the Pond, the District Court stated, "[t]hat connection to the river makes the pond an in-stream pond. In-stream ponds are prohibited." The District Court concluded that FCD had not erred by supplementing the administrative record with information about prior applications made by Donald Burton, because "[t]here is no evidence that the prior applications created bias on behalf of the [FCD] in making their determination on this application."

¶7 Burtons appeal.

5

## STANDARD OF REVIEW

¶8 "We review a district court's ruling on motions for summary judgment de novo, using the same M. R. Civ. P. 56 (Rule 56) criteria used by the district court." *Chapman v. Maxwell*, 2014 MT 35, ¶ 7, 374 Mont. 12, 322 P.3d 1029 (citation omitted). We review an agency's conclusions of law for correctness. *Stalowy v. Flathead Conservation Dist.*, 2020 MT 155, ¶ 10, 400 Mont. 266, 465 P.3d 1170. "An agency's interpretation of its rule is afforded great weight, and the court should defer to that interpretation unless it is plainly inconsistent with the spirit of the rule. The agency's interpretation of the rule will be sustained so long as it lies within the range of reasonable interpretation permitted by the wording." *Clark Fork Coal. v. Mont. Dep't of Env't Quality*, 2008 MT 407, ¶ 20, 347 Mont. 197, 197 P.3d 482.

¶9 A review of a final action by the conservation district supervisors or commissioners on a proposed project may be obtained by petitioning the district court of the county where the project is located. Section 75-7-121(1), MCA. The District Court noted that Burtons did not "petition the supervisors for a declaratory ruling under Section 75-7-125(2), MCA[,]" but rather "bypassed the declaratory ruling process and petitioned for judicial review pursuant to Section 75-7-121, MCA, rendering the declaratory ruling standards of review inapplicable." That ruling is not challenged on appeal.

## DISCUSSION

¶10 Burtons argue that the characteristics of the property, and the design of their proposed project, permissibly navigate through FCD's Adopted Rules and around prohibitions stated therein, and therefore FCD legally erred by denying their application,

6

which the District Court incorrectly upheld. They ask that the summary judgment in favor of FCD be reversed, and judgment be entered in their favor.

¶11    Specifically, regarding the Rules, they proffer: the Pond is not an "in-stream pond," and thus the prohibition of Chap. 3, O.2(a) ("[i]n-stream ponds are prohibited") does not apply; the Pond, originally an historical "scour feature," is not an "artificial" pond, and thus the prohibition of Chap. 3, I.2(h) ("[d]redging for the purpose of creating, enlarging, or improving an *artificial* harbor, lagoon, or in-stream pond is prohibited") (emphasis added) does not apply; the Pond is not an "impoundment," and, as their briefing states, "there is nothing in Burtons' application suggesting the naturally-created pond is an 'impoundment,'" and thus neither the definition of an "[i]n-stream pond" under Chap. 1, Rule 4(36) ("[i]n-stream pond means an *impoundment* of water located on the bed or immediate bank of a stream") (emphasis added) nor the definition of an "[o]ff-stream pond" under Chap. 1, Rule 4(36) ("[o]ff-stream pond means an *impoundment* of water located away from but connected to the bed or immediate banks of a stream by means of a ditch, pipeline, or conveyance system through which water is diverted from or into a stream") (emphasis added) applies; the application did not propose dredging in a "streambed" or a "bank," and thus the consideration required by Chap. 3, I.1(a) ("[i]n determining a reasonable means of dredging, consideration must be given to the fact that dredging of a streambed or bank could have adverse effects due to suspension of fine materials, re-suspension of nutrients and toxic materials, exposure of stable streambed sediments to unstable conditions, removal of stream bed armament and creation of steep bench areas") does not apply; the Pond does not discharge back to the River, there is no

7

evidence that the project would cause that to occur, and the District Court "erroneously treated the [Channel] as a continuous connection to the Flathead River in part by misconstruing a statement about the [P]ond's surface water connection" with the River in a letter from Burtons' hydrologist, and thus the concerns raised about impacts of dredging in a stream bed and return flows to the River are "gratuitous and irrelevant"; although conceding that the issue is not dispositive here, Burtons indicate the Pond area does not constitute "wetlands" under federal regulations; and, lastly, that the project falls outside the application of the Adopted Rules altogether, because the Pond is neither an in-stream nor an off-stream pond, and the Channel is exempted under Chap. 1, Rule 5(4) ("[t]hese rules do not apply to ditches, intermittent streams, or wetlands not associated with the bed or immediate banks of a stream") and under Chap. 1, Rule 5(5)(a)(iii) ("[a]rtificial or man-made waterways that have been constructed for the purposes of conveying water for any purpose are not considered a natural waterway").

¶12    Burtons' conclusion from this analysis is that the Adopted Rules do not prohibit or even apply to the project because the particular "configuration of the natural [P]ond and [the] artificial [C]hannel on Burtons' property to which the District Court referred has existed without FCD objection for decades.  Burtons' application did not seek approval for what was already there."  Therefore, as they argue, "[t]hese circumstances take Burtons' project outside of the prohibitions in FCD rules."

¶13    However, we reach a contrary conclusion.  While "impoundment" is not defined by the Rules, and gives an analytical opening to argue that the Pond fits neither the definition of "in-stream" or "off-stream" pond, it is difficult to envision how a pond can collect and

8

hold water without a natural or man-made catching or impounding of the water. As FCD argues, "[l]ogically, dredging a man-made channel to allow more water from the Flathead River to enter, dredging the pond, and placing the dredged material around the perimeter of the pond as proposed will result in the impoundment of additional water." Here, impounding originally occurred by a flow from the River entering a natural ditch or waterway to form the Pond, described as an historical "scour feature," and still occurs by way of the Channel that has artificially enhanced such flow by man-made efforts. The Channel is thus part natural and part artificial, and cannot be exempted under the Adopted Rules as entirely artificial. *See Bitterroot River Protective Ass'n v. Bitterroot Conservation Dist.*, 2008 MT 377, ¶ 37, 346 Mont. 507, 198 P.3d 219 (citing 1975 Mont. Laws ch. 463, § 2) ("When passing the 310 Law, the Legislature recognized man's impact, both past and future, upon the State's waters, requiring that rivers and streams 'are to be protected and preserved to be available in their *natural, or existing state*, and to prohibit unauthorized projects.'") (Emphasis in original.) Given this impoundment of water, the Pond satisfies the definition of at least an off-stream pond, as one "located away from but *connected to the bed or immediate banks of a stream by means of a ditch*, pipeline, or conveyance system through which water is diverted from or into a stream," Chap. 1, Rule 4(36) (emphasis added), the development of which, as noted by the FCD, is discouraged. *See* Adopted Rules, Chap. 3, O(2)(b) ("Off-stream ponds that are connected to a natural stream channel are discouraged."). "Immediate banks" is further defined as "the area above the mean high-water mark and directly adjacent to the stream, which when physically altered or modified has the potential to affect the state of a stream." Admin. R. M. 36.2.402(5)

9

(1997). Photographs submitted with the application indicate that the proposed soil removal area for dredging of the Channel includes the bank area directly along the River that flows past the property, indeed, portions of the bank itself.[4] Thus, characteristics of the project, including both the history of the Pond and the details of the proposed work, place it within the Adopted Rules' "discourage[ment]" of the project. While not categorically prohibited by the Rules, it is clear that Burtons' argument the FCD erred as a matter of law is incorrect.

¶14 Burtons want to exempt this project from the FCD's jurisdiction because it is an atypical "configuration of the natural pond and artificial channel" that arguably does not fit squarely within the Rules because it "has existed without FCD objection for decades" and their application "did not seek approval for what was already there." However, they are nonetheless seeking approval to enhance and expand this atypical use in ways that could well impact the River. As FCD argues, the proposed soil removal area, upon dredging, will clearly enhance the connection of the Pond to the River, and "[t]here is no proposed plan to restrict the flow of water through the man-made channel to and from the Flathead River." The FCD was prudent to question the dredging of the Channel and Pond, lying, as they do, directly adjacent to the River.

¶15 We affirm the District Court's conclusion that "[t]here is sufficient evidence to support the [FCD's] determination that the [C]hannel is connected to the stream bed of the Flathead River," and that, because "the [C]hannel is connected to the stream bed[,]" the

---

[4] We are not holding that a naturally occurring pond must necessarily be considered an artificial harbor or lagoon for purposes of the Adopted Rules merely because of the Legislature's general recognition of the human impact on the State's waters, but rather that the particular history here demonstrates that the Pond has been enhanced by artificial means.

10

project "does not fall within exceptions to the [FCD's] jurisdiction for ditches, etc. not connected to the stream bed." Consequently, we affirm the District Court's further conclusions that the FCD had jurisdiction over the project and denied the application pursuant to the Adopted Rules.

¶16 Burtons also argue that FCD's brief statement that "the project does not meet the stated purpose of protecting the pole barn" was a "conclusion[] without any rationale" and therefore was an insufficient basis for decision. We note that this statement by the FCD was made in addition to its assessment and application of the Adopted Rules to the project, discussed above. The District Court concluded that, despite any lack of explanation for all of its statements, the FCD nonetheless articulated sufficient legal grounds for denial of the permit within its entire analysis.[5] We agree that whatever insufficiencies existed in the FCD's explanation of some conclusions, such error was harmless in light of the other supported bases for denial. We further conclude that review of the prior applications was not error. *See DeBuff v. Mont. Dep't of Nat. Res. & Conservation*, 2021 MT 68, ¶ 34, 403 Mont. 403, 482 P.3d 1183 (it does not violate due process for an agency to "consider not only the evidence provided to it during the application process but also information within its records[,]" as long as the applicant is properly put on notice).

¶17 Affirmed.[6]

---

[5] The concern about whether the project would meet the purpose of protecting the pole barn would logically arise from the intention to direct significantly more water into the Pond.

[6] We note that the FCD's decision indicated the possibility of reviewing "project changes" that could properly alleviate the problem of flooding on the property.

11

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ KATHERINE M. BIDEGARAY